KNOLL, J,
concurring in part, dissenting in part.
Li agree with the majority opinion’s determination that there was no manifest error in the hearing committee’s factual findings and that the record fully supports the rule violations as found by the hearing committee and disciplinary board. However, I dissent from the imposition of a sanction less than disbarment, finding a three-year suspension makes light of the severity of this attorney’s conduct and sends the wrong message to the members of the bar and the public to whom attorneys owe a sacred trust.
Standard 4.31 of the ABA’s Standards for Imposing Lawyer Sanctions makes it *112 clear disbarment is generally appropriate when a lawyer represents a client knowing his own interest are adverse to the client’s with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client. Moreover, Standard 4.61 of the ABA’s Standards for Imposing Lawyer Sanctions calls for disbarment when a lawyer knowingly deceives a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.
Ungar would have us believe that after rejection of the class action certification his involvement was merely passive and that the Milberg Weiss and O’Quinn firms made all the decisions and confected the settlement agreement. Despite finding no merit to that contention, a majority of this Court nevertheless diminishes Ungar’s wrongdoing when it opts for a downward deviation from the baseline sanction. I simply cannot agree with that choice.
12After hearing live testimony and evaluating various pieces of documentary evidence, the hearing committee found Un-gar:
• had an obligation to keep his clients informed and engage them in decision-making because his association of other counsel did not allow him to unilaterally forego or abdicate his responsibilities to his clients;
• failed to communicate necessary and important information to permit his clients to make informed decisions about their legal matter, specifically with regard to the settlement offers and the ultimate settlement of the case;
• attempted to secure a fee in derogation of the contingency fee contracts he . signed with his clients;
• withheld information from his clients and attempted to hide the amount of the settlement so that he could charge an excessive fee;
• participated in settlement negotiations and proposed a disbursement to his clients that were contrary to the best interest of his clients;
• participated in the confection of a settlement without full disclosure to his clients; and,
• employed coercive tactics in an attempt to obtain his clients’ signature to a release and settlement.
Finally, and most importantly, it was found Ungar’s actions were deliberate, dishonest, deceitful, and motivated by self-interest.
“I am not bound to win, but I am bound to be true. I am not bound to succeed, but I am bound to live by the light that I have. I must stand with anybody that stands right, and stand with him while he is right, and part with him when he goes wrong.” Abraham Lincoln, Speech at Peoria, IL (Oct. 16, 1854). Ungar failed to heed this sage advice — instead of divulging the terms of the settlement agreement and | .-¡disassociating himself from the Milberg Weiss and O’Quinn firms, he opted to leave his clients in the dark as he was blinded by the lucre that was almost certain to be his. As the record shows, Ungar, fully aware of the existence of the contingent fee contracts he entered into and the terms of the settlement agreement, continued to hide the pea as if this was nothing more than a shell game. Moreover, Ungar went so far as to attempt to have his clients sign release documents in which they were required to certify they had been provided the details of the settlement. “[T]he love of property and a consciousness of right or wrong have conflicting places ... which often make a man’s course seem crook[ed,] his conduct a riddle.” Abraham Lincoln, Speech at Hartford, Connecticut (March 5, 1860). Significantly, Ungar’s conduct was not self-reported. Rather, his conduct mirrors the classical conduct of one “get *113 ting caught with his hand in the cookie jar.” Although Ungar did not ultimately receive a legal fee, a course of action that only developed after Mrs. Cutrera retained Thomas Cortazzo as independent counsel and Ungar retained an “ethics counsel” to advise him, the course of Ungar’s conduct speaks volumes and further highlights the obvious — Ungar’s paramount concern was not the representation of his clients, but an attempt to secure an ill-contrived fee.
Most telling in this regard was the March 2001 meeting at the New Orleans Lakefront Airport which Ungar, Melvyn Weiss, John O’Quinn, and Cortazzo attended after he had retained an “ethics counsel.” Despite Cortazzo’s continued attempts to receive settlement information, Ungar persisted in his request that Mrs. Cutrera should accept the settlement, all to the detriment of Mrs. Cutrera, who was denied the very tool needed for her to properly evaluate the settlement offer. Clearly, Ungar’s deceptive conduct at this meeting highlights the fact he chose to advocate against his client.
|4It gives me great pause to think what would have happened if Ungar’s roadblocks to truth had been successful and Mrs. Cutrera had simply acquiesced to Ungar’s self-motivated and deceptive counsel to sign the release. Had this happened, Ungar’s egregious conduct would have been swept under the carpet and he would have been free to use his license to practice law to feather his own nest to the detriment of a future, unsuspecting public. Ungar’s use of his license to practice law in this manner causes great harm to the legal profession and the public. Such questionable conduct should neither be condoned nor tolerated. Moreover, Un-gar’s conduct causes the public to harbor a real disdain for the legal profession and forever tarnishes the legal profession. Abraham Lincoln once said, “[Rjesolve to be honest at all events; and if in your own judgment you cannot be an honest lawyer, resolve to be honest without being a lawyer.” Abraham Lincoln, Notes for a Law Lecture (July 1,1850).
I find Standards 4.31 and 4.61 of the ABA Standards for Imposing Lawyer Sanctions particularly applicable to the present case. For these reasons, I find Ungar’s disbarment is the baseline standard from which I find no downward deviation merited. Rather, I find instead of considering a downward deviation, we should be debating whether permanent disbarment is merited.